O

# United States District Court
# Central District of California

| | |
|---|---|
| KAHALA FRANCHISING, LLC,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>REAL FAITH, LLC, et al.,<br><br>　　　　　　Defendants. | Case № 2:21-cv-08115-ODW (SKx)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [14]** |

## I.   INTRODUCTION

Plaintiff Kahala Franchising, Inc., the owner of the trademarks associated with the Pinkberry frozen yogurt brand, sues Defendants Real Faith, LLC and D'Mari Jackson for continuing to operate a Pinkberry franchise as a terminated holdover franchisee.  Kahala now seeks a preliminary injunction by way of a fully briefed Motion.  (Mot. Prelim. Inj. ("Motion" or "Mot."), ECF No. 14; Opp'n, ECF No. 35; Reply, ECF No. 38.)  Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.  For the following reasons, the Court **DENIES** Kahala's Motion.

## II. BACKGROUND

Plaintiff Kahala is the owner of the trademarks associated with the Pinkberry frozen yogurt brand, which was founded in Los Angeles in 2005 and has expanded to over 100 locations. (Compl. ¶ 5, ECF No. 1.) As a franchisor, Kahala licenses its trademarks to franchisees who use the marks in connection with the operation of their franchises. (*See id.* ¶¶ 9–10.) As with most restaurant franchise operations, Kahala provides its franchisees with business methods, technical knowledge, marketing concepts, recipes, processes, information on supply sources, business forms, trade dress, employee training techniques, and other types of business assistance. (Decl. Kim Lane ("Lane Decl.") ¶ 4, ECF No. 14-5.) In exchange, each franchisee pays Kahala royalty payments and contributions based on a percentage of the franchise's gross revenue. (*Id.* ¶ 7.)

On February 15, 2019, Defendant Real Faith, a limited liability company franchisee, entered into a written franchise agreement with Kahala to operate a Pinkberry frozen yogurt franchise in Beverly Hills, California.[1] (*Id.* ¶ 8.) On April 19, 2019, Bernadine Y. Jackson, then the managing member of Real Faith, passed away. In accordance with the parties' agreement, Mrs. Jackson's son, Defendant D'Mari Jackson (herein, "Jackson"), continued Real Faith's operation of the Pinkberry franchise. (Lane Decl. ¶ 13; Decl. D'Mari Jackson ("Jackson Decl.") ¶ 5, ECF No. 35-1.) Jackson spoke to a Kahala representative about the transfer process, which, under the parties' franchise agreement, had to be completed during the ninety-day period following Mrs. Jackson's passing. (Lane Decl. ¶ 14.) The parties did not complete the transfer process because the transfer cost was, in Jackson's estimation, too high. (Jackson Decl. ¶ 5.)

During this ninety-day period, Real Faith, acting through Jackson, executed a promissory note with Kahala, agreeing to pay Kahala a principal sum of $181,223.68

---

[1] That same day, Real Faith entered an additional, separate sublease with Pinkberry, Inc. to lease the premises at which Real Faith's Pinkberry franchise would operate. (*Id.* ¶ 11.) The parties' rights and obligations under the sublease are not directly at issue in the present case.

plus interest by way of twenty-four monthly payments of approximately $7,500 each. (Lane Decl. ¶ 15, Ex. D.) The balance constituted amounts due from past rents, royalties, advertising fees, and transfer fees. (*Id.*) Real Faith never made any payments on this promissory note. (*Id.* ¶ 18.) Moreover, since August 2020, Real Faith has not made any royalty payments under its franchise agreement with Kahala, and since October 2020, it has not made any rent payments to Pinkberry, Inc. (*Id.*)

On June 18, 2021, Kahala sent Jackson a Notice of Termination, terminating the parties' franchise agreement for failure to pay royalties, advertising fees, and rent despite repeated notice and opportunity to cure. (*Id.* ¶ 19.) Pursuant to the terms of the parties' franchise agreement, this terminated Defendants' license to use Kahala's Pinkberry trademarks. (*Id.*) Nevertheless, Defendants continue to operate their franchise. On October 1, 2021, Kahala's attorney visited the franchise location and noted "long lines of customers" and employees "busy serving customers with PINKBERRY products." (Decl. Jennifer Y. Ro ("Ro Decl.") ¶ 4.) Jackson, for his part, wants to continue to operate the franchise location and has applied for emergency loans from the Small Business Administration in order to, among other things, pay any money it may owe to Kahala or to Pinkberry, Inc. (Jackson Decl. ¶ 11.)

On October 12, 2021, Kahala filed this action, setting forth claims for and related to trademark infringement under federal and state law. (Compl., ECF No. 1.) Kahala's central allegation is that Defendants improperly continue to use the Pinkberry trademarks in breach of the parties' license agreement and are therefore infringing those trademarks. (*Id.* ¶¶ 43–44.) After Kahala filed this Motion, Defendants defaulted, but the Court set aside the default and allowed Defendants to oppose. (Min. Order, ECF No. 34.)

### III.   LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" courts may grant to preserve the status quo pending trial to prevent immediate and irreparable injury. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); Fed. R. Civ. P. 65(a); *see*

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). To obtain a preliminary injunction, the plaintiff must clearly establish: (1) a likelihood of success on the merits; (2) that the plaintiff will suffer irreparable harm if the preliminary relief is not granted; (3) that the balance of equities tips in the plaintiff's favor; and (4) that the injunction is in the public interest. *See Winter*, 555 U.S. at 20. Under 15 U.S.C. § 1116(a) as modified by the Trademark Modernization Act of 2020, a plaintiff seeking an injunction to prevent trademark infringement is entitled to a rebuttable presumption of irreparable harm upon a finding of likelihood of success on the merits. *Cisco Sys., Inc. v. Wuhan Wolon Commc'n Tech. Co.*, No. 5:21-cv-04272-EJD, 2021 WL 4962661, at *7 (N.D. Cal. July 23, 2021) (quoting Pub. L. No. 116-260 (2020)); *Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, No. 4:19-cv-01424-YGR, 2021 WL 254448, at *14, n. 16 (N.D. Cal. Jan. 26, 2021); *cf. Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n.3 (9th Cir. 1989) ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted.").

The party moving for the preliminary injunction bears the burden of establishing its need. *Traeger Pellet Grills, LLC v. Dansons US, LLC*, 421 F. Supp. 3d 876, 882 (D. Ariz. 2019). The moving party must meet this burden with a "clear showing" that the preliminary injunction is warranted. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003). Moreover, in ruling on an application for preliminary injunction, the court may consider evidence that would not be admissible at trial. *See, e.g.*, *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) ("A district court may . . . consider hearsay in deciding whether to issue a preliminary injunction.").

## IV. DISCUSSION

For the following reasons, although Kahala has shown some measure of likelihood of success on the merits of its claims, thus entitling it to a presumption of irreparable harm, Defendants rebut this presumption in at least equal measure. Moreover, the balance of equities tips somewhat in Defendants' favor. Thus, preliminary injunctive relief is not appropriate.

### A. Likelihood of Success on the Merits

"In the trademark context, 'state common law claims of unfair competition and actions pursuant to the California Business and Professions Code § 17200 are substantially congruent to claims made under the Lanham Act.'" *Alixir Co. v. Qué Onda Beverage, Inc.*, No. 2:20-cv-08368-RGK-RAO, 2021 WL 971057, at *6 (C.D. Cal. Jan. 6, 2021) (quoting *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994)). Both sides indicate they generally agree with this principle by arguing about trademark infringement, and the effects thereof, without tethering the arguments to any particular cause of action. The Court thus proceeds by focusing on Kahala's primary claim for trademark infringement under the Lanham Act. To prove a claim of trademark infringement, a plaintiff must show: (1) that it has a valid, protectable trademark, and (2) that defendant's use of the mark is likely to cause confusion. *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007) (citing *Brookfield Commc'ns v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047, 1053 (9th Cir. 1999)). Kahala demonstrates a moderately strong likelihood of success on the merits of its trademark infringement claim. Defendants do not dispute that they owe money to Kahala due to unpaid rents, royalties, and advertising contributions and are therefore in default. Defendants also do not dispute that in the event of a default, the operative franchise agreement allows Kahala to terminate the franchise agreement, including Defendants' right to use the Pinkberry trademarks. Further, Defendants do not dispute that Kahala actually exercised its right of termination. Real Faith is therefore a terminated holdover franchisee, and it is "well settled doctrine that a terminated franchisee's continued use

of its former franchisor's trademarks, by its very nature, constitutes[] trademark infringement." *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992); *Century 21 Real Estate LLC v. All Prof'l Realty, Inc.*, 600 F. App'x 502, 508 (9th Cir. 2015) (finding trademark infringement where franchisee continued to use franchisor's mark without consent following termination of franchise agreements and noting likelihood of confusion that would arise from holdover franchisee's use of mark); *Gen. Motors LLC v. W. Covina Motors, Inc.*, No. CV 15-705-JFW (AGRx), 2015 WL 12762063, at *13 (C.D. Cal. Apr. 13, 2015).

        1.     *Force majeure clause defense to nonpayment*

The case, however, is not open-and-shut; Defendants present defenses which, if meritorious, could imply that Kahala's termination of the franchise agreement was improper, which in turn would mean that Real Faith never lost its license to use the Pinkberry trademarks, thus defeating Kahala's claim of trademark infringement. First, Defendants point to the force majeure clause in the franchise agreement, which excuses either party from performance when the failure is due to certain losses created by government orders and regulations or "acts of God." (Jackson Decl. Ex. A ("Franchise Agreement") § 16.19, ECF No. 35-2.) Defendants argue that the COVID-19 pandemic and the civil authority orders issued in connection therewith fall under the purview of this force majeure clause, thus excusing Real Faith in whole or part from payment of its obligations. (Opp'n 7–9.)

Admittedly, there are weaknesses in this defense. For example, Defendants suggest that the force majeure clause applies when a government order causes *any sort* of loss of profits that leads to an inability to pay. (Opp'n 8.) But this does not appear to be the proper reading of the force majeure clause. Instead, the first part of the force majeure clause applies when the government order creates a "transportation shortage[]" or an "inadequate supply of equipment, merchandise, supplies, labor, material[,] or energy," which in turn creates an inability to pay. (*Id.*) Defendants submit no evidence suggesting that any of these particular conditions occurred.

Nevertheless, it is possible that some COVID-19-related loss of profits could be found to result from "acts of God" (the second part of the force majeure clause), which in turn would "excuse performance, in whole or part, as may be reasonable," under the franchise agreement. (*Id.*) This defense thus has some cognizable merit.

### 2. *Waiver and reasonableness defenses to failure to transfer ownership of franchise*

Nonpayment is not the only basis on which Kahala terminated the franchise agreement; it also terminated for Jackson's failure to transfer the franchise following the passing of Ms. Jackson. (Lane Decl. Ex. E ("Notice of Default") § A, ECF No. 14-10.) In response, Defendants raise the defense of waiver. Specifically, Defendants argue Kahala waived its right to terminate the franchise agreement on the basis of failure to transfer because, for over a year after any breach of the transfer terms, Kahala continued to accept payments from Real Faith and allow it to operate the franchise. (Opp'n 10.)

This argument has substantial merit. "[W]aiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." *See Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78 (2017). Thus, courts applying California law[2] "will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 678 (2000); *cf. Wyler Summit P'ship v. Turner Broad. Sys.*, 135 F.3d 658, 662 (9th Cir. 1998) (noting that waiver of a contractual provision "is a well-established principle of California law"). Here, by allowing Real Faith to continue to operate the franchise for over a year despite knowing that Jackson had not completed the transfer process, Kahala clearly indicated that it intended not to terminate the franchise agreement on the sole

---

[2] Neither party disputes that Defendants' waiver argument should be applied and analyzed under California law.

basis of Jackson's failure to transfer, and Jackson could have reasonably believed Kahala had relinquished the right to do so.[3]

The Court could find, on this basis, that terminating the franchise agreement on the basis of failure to transfer was inappropriate. Nevertheless, as discussed above, Defendants do not as strongly rebut Kahala's other reason for terminating the franchise agreement: nonpayment. Overall, Kahala appears to have a moderately strong likelihood of succeeding at demonstrating trademark infringement.

**B.    Irreparable Harm**

Given that Kahala demonstrates a likelihood of success on its trademark infringement claim, Kahala is statutorily entitled to a presumption of irreparable harm for the purposes of its request for a preliminary injunction. 15 U.S.C. § 1116(a). This presumption is rebuttable, meaning that Defendants may, upon a proper showing, overcome it and demonstrate a lack of irreparable harm. *Vital Pharms. v. PhD Mktg., Inc.*, No. CV 20-6745-RSWL (JCx), 2021 WL 6881866, at *5 (C.D. Cal. Mar. 12, 2021). Such a showing might consist of a demonstration that the plaintiff delayed in seeking the preliminary injunction, that the alleged injuries are purely pecuniary, or that the non-movant has ceased or will soon cease the infringing activities. *Id.*

Defendants meet this burden. Defendants demonstrate that Real Faith's franchise is continuing to operate as a successful franchise, with many customers visiting the store and no indication that Real Faith is running the franchise in a way that fails to meet Kahala's standards and expectations regarding the Pinkberry brand, such as by, for example, selling inferior yogurt or allowing the premises to fall into disrepair. Thus, while there may be confusion in the minds of the public (i.e., while the public might think that Real Faith's Pinkberry is a franchise authorized by the company that owns

---

[3] The franchise agreement also provides that Kahala "shall not unreasonably withhold or delay [its] consent to a Transfer." (Franchise Agreement § 12.4(c).) The Court could find that unreasonably high transfer fees constitute unreasonably withholding or delaying consent to a transfer. Neither party provided the Court with information about the actual amount of fees, though, so the Court is unable to determine the strength of this defense fully and fairly.

the Pinkberry marks), Kahala nevertheless fails to show how this confusion is causing it any actual or potential harm.

The contrast between this case and *Wetzel's Pretzels, LLC v. Johnson*, 797 F. Supp. 2d 1020 (C.D. Cal. 2011), is instructive. The *Wetzel's Pretzels* case also involved a terminated holdover franchisee. The franchisor moved for a preliminary injunction to stop the franchisee's infringement of its trademarks in the Wetzel's Pretzels brand. The franchisor obtained a preliminary injunction, but the key distinguishing fact was that the franchisor had submitted evidence showing that the franchisee had not complied with upkeep and maintenance of the store so as to conform to standards set forth in the franchise agreement. *Id.* at 1022. If a consumer was confused, believing that the owner of the Wetzel's Pretzels brand had given authorization to the franchise, the public would associate an unmaintained, unkempt franchise with the Wetzel's Pretzels brand, thus harming the brand's reputation. *Id.* at 1026–28 (discussing, at length, multiple visits the franchisor made to the franchise, and the "deficiencies in the store's upkeep and maintenance" noted each time). Here, by contrast, Kahala makes no suggestion that Defendants are running their franchise in an inferior manner, and if anything, as discussed, the evidence from both sides suggests that the franchise is a popular location that is representing the Pinkberry brand in a satisfactory manner. Without any evidence indicating that Defendants are running the franchise in a deficient manner, the Court cannot conclude that the harm arising from Defendants' continued use of the Pinkberry trademarks is irreparable or otherwise more than merely pecuniary.

Undeterred, Kahala argues that it has lost the ability to control Defendants' use of its marks, thus creating the potential for damage to its reputation, and it cites *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) for the proposition that "[p]otential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." (Mot. 19.) However, *CytoSport* was not a franchisor/franchisee case; instead, it was a suit by one beverage maker against a different beverage maker who was marketing a completely

different beverage in a way that was causing confusion about its origin. *Id.* at 1060–1062. The difference between the two products is what caused the "potential" for damage to reputation. *Id.* at 1080–81. Moreover, in *CytoSport*, there was evidence that customers believed the infringing product came from the mark holder *and that the product was inferior*. *Id.* at 1063 ("One customer contacted plaintiff to complain that he did not like the new formula for plaintiff's . . . product; however, the customer had actually purchased defendant's . . . product and mistaken it for plaintiff's product."). Here, there is no such difference between two products, or any cited difference for that matter; the evidence indicates that Defendants are running the franchise like any other Pinkberry franchise and are representing the brand in a satisfactory manner while doing so.[4]

While Kahala might, after eventual trial of this matter, be entitled to a trademark injunction prohibiting Defendants from continuing to use the Pinkberry marks, Kahala is only entitled to the expedited, trial-less remedy of preliminary relief if it can show that it is necessary to prevent *irreparable* harm. The Trademark Modernization Act of 2020 did not eliminate the irreparable harm requirement; it simply shifted which party bears the ultimate burden of production on the issue. *PhD Mktg*, 2021 WL 6881866, at *5 ("The presumption of irreparable harm acts as a procedural device which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer." (quoting *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996)) (cleaned up)). Here, Defendants meet their burden of production, thereby

---

[4] Kahala's principal legal error is that it repeatedly conflates case law regarding when a *final* trademark injunction is appropriate with case law regarding when a *preliminary* injunction in a trademark dispute is appropriate. The difference, of course, is the irreparable harm requirement.

This is not, by any means, Kahala's only legal error. Kahala's briefs are once again laden with the sort of imprecise argumentation and inaccurate summarizing of cases that is anathema to sound legal reasoning and the orderly administration of justice. (*See, e.g.*, Reply 8 (asserting that continued use of a trademark after termination of a franchise agreement "invariably" causes irreparable injury, followed by a series of citations, none of which states or suggests that this connection is "invariable").)

rebutting the presumption of irreparable harm. Given that the presumption is rebutted, the potential for irreparable harm is, in this case, too weak to support injunctive relief.

**C.     Balance of Equites; Public Interest**

To prevail on a motion for preliminary injunction, a plaintiff must show that the balance of equities tips in its favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter*, 555 U.S. at 20). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *United Artists Corp. v. United Artist Studios LLC*, No. CV 19-828-MWF (MAAx), 2019 WL 3293650, at *13 (C.D. Cal. June 3, 2019) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S 531, 542 (1987)). Courts may consider the relative sizes of the respective businesses in balancing the hardships. *See Sardi's Rest. Corp. v. Sardie*, 755 F.2d 719, 726 (9th Cir. 1985) (observing that "the relative size of the respective businesses . . . is certainly relevant to the potential hardship" of complying with an injunction); *see also Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) (providing that, in analyzing the balance of hardships, "the relative size and strength of each enterprise may be pertinent").

In this case, the balance of equities slightly favors Defendants. If the Court grants the Motion, Defendants will have to cease doing business as a Pinkberry franchise. While Kahala suggests that such an injunction would not stop Defendants from selling frozen yogurt, the Court is unconvinced by the contention that Defendants would be able to continue to sustainably run an unbranded yogurt store with none of the assistance it had previously received from Kahala regarding sourcing, training, branding, and marketing. Thus, the Court can reasonably assume that granting the Motion will cause business at the franchise location to cease, at least temporarily. This would have negative consequences on *both* Kahala and Defendants: Kahala, because it would no longer earn any royalties or other compensation from operation of the location, and Defendants, because it would effectively eliminate most or all of their business income.

It would also have a negative impact on the public interest, which generally favors continuity of business operations, especially when the business is a successful franchise of a popular yogurt brand in a prime location. Moreover, Kahala, a large business, would ostensibly be able to absorb the loss engendered by ceasing operations at the franchise, whereas Real Faith, whose entire business is the franchise, would not. *See PhD Mktg.*, 2021 WL 6881866, at *8.

By contrast, denying the Motion will facilitate continuity of business operations. Defendants could continue to operate the franchise, generating profits for themselves and royalties for Kahala, while the parties work out their differences and Defendants work toward complying with their contractual obligations to Kahala. (*Cf.* Jackson Decl. ¶ 11 (noting Jackson's intent "to work with Kahala and determine and pay what, if any, amounts are owed").) For the reasons noted above, any additional harm Kahala might incur in this process is not irreparable and is instead compensable by way of money damages. Nothing suggests that Defendants' operation of the franchise is deficient, and everyone stands to gain some sort of benefit by allowing operations to continue, at least for the moment. Thus, the balance of equities tips somewhat in favor of Defendants.

The final consideration, the public interest, also tips slightly in Defendants' favor, for these same reasons.

Given that Defendants successfully rebut the presumption of irreparable harm and the balance of equities and consideration of the public interest both weigh slightly in Defendants' favor, the Court finds that Kahala does not clearly demonstrate entitlement to a preliminary injunction. *Cf. PhD Mktg.*, 2021 WL 6881866, at *8 ("Under the facts of this case, a preliminary injunction is unwarranted because it may work to alter the status quo more than it would to preserve it.").

///

///

///

## V. CONCLUSION

For the reasons discussed above, the Court **DENIES** Kahala's Motion for Preliminary Injunction. (ECF No. 14.)

**IT IS SO ORDERED.**

May 20, 2022

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**